**UNITED STATES of America**

v.

**WESTERN ELECTRIC COMPANY, INC., et al., Bell Atlantic Corporation, Appellant.**

**UNITED STATES of America**

v.

**WESTERN ELECTRIC COMPANY, INC., et al., Pacific Telesis Group, Appellant.**

**UNITED STATES of America**

v.

**WESTERN ELECTRIC COMPANY, INC., et al., US West, Inc., Appellant.**

Nos. 86–5118, 86–5163 and 86–5164.

United States Court of Appeals, District of Columbia Circuit.

Argued May 16, 1986.

Decided Aug. 15, 1986.

Robert B. McKenna, Jr., with whom L. Andrew Tollin and Kenneth D. Patrich, Washington, D.C., were on brief, for appel-

lant US West, Inc. Robert W. Barker, Washington, D.C., also entered an appearance for appellant US West, Inc.

Robert A. Levetown, with whom John M. Kelleher, John M. Goodman, Jane C. Luxton, and Michael J. Shortley, III, Washington, D.C., were on brief, for appellant Bell Atlantic Corp.

Stanley J. Moore and Robert V.R. Dalenberg, San Francisco, Cal., were on brief, for appellant Pacific Telesis Group.

Catherine G. O'Sullivan, Atty., Dept. of Justice, with whom Robert B. Nicholson, Kevin R. Sullivan, John P. Fonte, and Donald S. Clark, Attys., Dept. of Justice, Washington, D.C., were on brief, for appellee U.S.

Howard J. Trienens and David W. Carpenter, Chicago, Ill., were on brief, for intervenor/appellee AT & T. Jonathan S. Hoak, Chicago, Ill., also entered an appearance for intervenor/appellee AT & T.

Chester T. Kamin and Michael H. Salsbury, Chicago, Ill., were on brief, for intervenor MCI Communications Corp.

Richard E. Wiley and R. Michael Senkowski, Washington, D.C., were on brief, for amicus curiae Radio Common Carrier Div. of Telocator Network of America, urging affirmance.

Edgar Mayfield, Bedminster, N.J., Mary Whitten Marks, and Liam S. Coonan, Washington, D.C., were on brief, for amicus curiae Southwestern Bell Corp., urging reversal.

Richard Metzger, Chicago, Ill., was on brief, for amicus curiae American Information Technologies Corp., urging reversal.

Norman C. Frost and R. Frost Branon, Jr., Atlanta, Ga., were on brief, for amicus curiae BellSouth Corp., urging reversal.

John B. Messenger and Gerald E. Murray, New York City, were on brief, for amicus curiae NYNEX Corp., urging reversal.

Genevieve Morelli, Washington, D.C., entered an appearance for appellee Nat. Ass'n of Regulatory Utility Com'rs.

Before MIKVA, SCALIA and BUCKLEY, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

This case presents a number of questions arising from the 1982 antitrust consent decree under which American Telephone and Telegraph Company ("AT & T") was divested of the Bell operating companies ("BOCs")—the twenty-two AT & T subsidiaries engaged in the business of providing local telephone service. The consent decree provided for the creation of seven regional holding companies ("RHCs") to own and operate the BOCs,[1] and it subjected the BOCs to stringent line-of-business restrictions. The district court has been asked on a number of occasions to interpret the scope of these restrictions, and in this case three of the RHCs challenge one such interpretation.

Appellant US West asks us to hold that the restrictions of the consent decree are not binding on the RHCs because they were not parties to it. Appellants US West, Bell Atlantic, and Pacific Telesis dispute the district court's finding that the consent decree prohibits the RHCs from providing "exchange telecommunications services," including two-way mobile telephone and one-way paging services, outside of their respective geographic regions. Bell Atlantic also appeals a subsequent order requiring it to discontinue the extraregional activities of its paging service subsidiary. Finally, US West appeals the district court's denial of a request by Ameritech for authorization to provide "shared tenant services," which would allow tenants of a building to use centralized facilities to route long distance calls in accordance with predetermined cost and traffic analysis criteria.

---

1. The seven RHCs are American Information Technologies Corp. ("Ameritech"), Bell Atlantic Corp., BellSouth Corp., NYNEX Corp., Pacific Telesis Group, Inc., Southwestern Bell Corp., and US West, Inc.

We hold that the RHCs are bound by the consent decree, that the decree does not prevent the RHCs from providing exchange services outside their geographic regions, and that the district court therefore erred in ordering the RHCs to stop providing extraregional exchange services. We do not reach the merits of the shared tenant services issue because Ameritech did not appeal the district court's denial of its request for a ruling that the decree permitted such services, and US West is without standing to obtain review of the district court's decision.

### I. FACTUAL BACKGROUND

The January 1, 1984 breakup of the Bell System stems indirectly from an antitrust action brought against AT & T by the Justice Department in 1949. This action led to the entry of a consent decree in 1956 that prohibited AT & T from conducting any business unrelated to providing common carrier communications services. In 1974 the government brought a second antitrust action alleging that AT & T had used its monopoly (or "bottleneck") control over local telephone service to the disadvantage of competitors in the long distance and telecommunications equipment markets. While this action was being tried in the district court, the parties announced an agreement by which they proposed to settle the case. *See generally United States v. American Telephone and Telegraph Co.,* 552 F.Supp. 131, 135–40 (D.D.C.1982), *aff'd mem. sub nom., Maryland v. United States,* 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983).

The proposed consent decree split the Bell System into two basic parts—the competitive portion of the business, which would provide long distance service, manufacture telecommunications equipment, and conduct research, and the noncompetitive portion of the business, which would continue to have bottleneck control of local telecommunications service. The competitive portion was to be retained by AT & T and its Western Electric and Bell Labs subsidiaries, while the noncompetitive por-

tion was assigned to the RHCs and their BOC subsidiaries. The distinction between the two portions of the business was to be preserved by creating "exchange areas," generally centering on a metropolitan area, within which BOCs would provide "exchange telecommunications services" consisting principally of local telephone service. The right to provide long distance "interexchange telecommunications services" was reserved to AT & T and its non-Bell System competitors. *See generally id.* at 140–43.

In accordance with the provisions of the Tunney Act, 15 U.S.C. § 16(b)–(h), the district court conducted public proceedings to determine whether the proposed consent decree was in the public interest. As a result of these proceedings, the district court made a number of relatively minor changes in the proposed decree and authorized its implementation. *United States v. American Telephone and Telegraph Co.,* 552 F.Supp. at 225. The divestiture formally took place on January 1, 1984, when ownership of the twenty-two BOCs was transferred to the seven RHCs, and the stock of the RHCs was distributed to AT & T's shareholders.

This case involves the extent to which the RHCs and BOCs are prohibited by the consent decree from engaging in certain business activities. The principal business restrictions on the BOCs are set forth in section II(D) of the consent decree, which provides that:

After completion of the reorganization ... no BOC shall, directly or through any affiliated enterprise:

1. provide interexchange telecommunications services or information services;

2. manufacture or provide telecommunications products or customer premises equipment (except for provision of customer premises equipment for emergency services); or

3. provide any other product or service, except exchange telecommunications and exchange access service, that is not a

natural monopoly service actually regulated by tariff.[2]

This provision is subject to section VIII(C) of the decree, which states:

> The restrictions imposed upon the separated BOCs by virtue of section II(D) shall be removed upon a showing by the petitioning BOC that there is no substantial possibility that it could use its monopoly power to impede competition in the market it seeks to enter.

Because of uncertainty over whether certain proposed business ventures were permissible under section II(D), such that no waiver under section VIII(C) would be necessary to engage in them, several RHCs filed motions for clarification with the district court.[3] In a decision dated January 13, 1986, the district court denied all of the motions. *See United States v. Western Electric Co.,* 627 F.Supp. 1090 (D.D.C. 1986).

Two district court determinations are pertinent to this appeal. First, the court held that RHCs may not provide two-way mobile telephone and one-way paging services outside of their geographic regions absent a section VIII(C) waiver. The court reasoned that such services are "exchange telecommunications services" under the consent decree and that the decree implicitly prohibits the RHCs from providing exchange services outside of their geographic regions. Second, the court ruled that the decree prohibits the RHCs from selling certain "shared tenant services" within their regions. Sales of such services essentially involve bulk purchase of long distance service from interexchange carriers and discount resale of this service to groups of office building tenants. The proposal before the court did not involve sale of a complete package of shared tenant services. Rather, Ameritech proposed to sell such elements of shared tenant service as "least-cost routing," which involves programming a switch to select interexchange carriers in accordance with customers' wishes, and "traffic analysis," which involves studying customers' long distance usage patterns in order to facilitate routing at the lowest cost. The court explained that such services constitute "interexchange telecommunications services," which the BOCs are prohibited from offering under section II(D) of the consent decree.

In an order dated February 14, 1986, the district court noted that Pacific Telesis, Southwestern Bell, and Bell Atlantic were providing mobile telephone and paging services outside of their regions and reviewed the plans that the three companies had submitted for complying with the court's January 13 decision. Pacific Telesis and Southwestern Bell had both pledged to discontinue all extraregional exchange services within ninety days, and the court agreed to grant these companies until April 17, 1986 to terminate their extraregional operations. Bell Atlantic had promised to discontinue the extraregional mobile telephone operations of its A Beeper Company subsidiary, but it asked for permission to continue providing extraregional paging services pending Justice Department review of its petition for a waiver under section VIII(C) of the consent decree authorizing it to remain in that business. The court denied this request and ordered Bell Atlantic to stop providing exchange servic-

---

**2.** The final consent decree is appended to the district court decision in *United States v. American Telephone and Telegraph Co.,* 552 F.Supp. 131, 226–34 (D.D.C.1982).

**3.** Ameritech filed motions requesting that the decree be interpreted to permit the RHCs to provide, *inter alia,* cellular radio services, including paging and mobile telephone services, outside of their geographic regions and shared tenant services to long distance users within their regions. US West similarly asked for a ruling that it could provide cellular radio servic-

es outside of its region. US West's district court brief supported Ameritech's motion with respect to shared tenant services, but US West did not join in that motion. Pacific Telesis asked that the decree be interpreted to permit it to provide exchange telecommunications services, including paging and mobile telephone services, outside of its region. Bell Atlantic filed a brief in support of Pacific Telesis' motion, but did not join that motion. *See United States v. Western Electric Co.,* 627 F.Supp. 1090, 1093 n. 1 (D.D.C.1986).

es outside of its region by April 17, 1986. This order was subsequently stayed pending appeal of the court's January 13 and February 14 orders.

On February 26 the district court granted a waiver to Pacific Telesis authorizing it to provide certain extraregional paging and mobile telephone services. A waiver was also granted to NYNEX on March 13, permitting it to provide mobile telephone service outside of its region. On May 14 the district court granted a waiver to Bell Atlantic, authorizing its A Beeper Company subsidiary to provide extraregional paging services. This waiver, however, is subject to the limitation that A Beeper not market paging services actually provided by other RHCs and their BOC subsidiaries. Because much of A Beeper's extraregional business consists of marketing services provided by other RHCs, Bell Atlantic has continued to express dissatisfaction with the district court's decisions.

In this appeal, US West, Bell Atlantic, and Pacific Telesis seek reversal of the district court's January 13 decision insofar as it prohibits the RHCs from providing extraregional exchange services without prior court approval. Bell Atlantic also appeals the court's February 14 order limiting the operations of its A Beeper Company subsidiary. In addition, US West appeals the portion of the January 13 decision that denies Ameritech's request for authorization to provide shared tenant services. The court's subsequent orders granting waivers to Pacific Telesis, NYNEX, and Bell Atlantic are not directly at issue in this appeal.

## II. DISCUSSION

### A. *Applicability of the Consent Decree to the RHCs*

■ Alone among the RHCs, US West argues that the consent decree does not bind the RHCs. US West advances two lines of analysis, either one of which it contends compels the conclusion that the RHCs are free to provide the services at issue in this case. First, it claims that application of the consent decree's restrictions to the RHCs and BOCs offends due process because the RHCs and BOCs were not parties to the underlying antitrust proceeding, did not have independent legal representation, and never actually consented to the decree. Second, it asserts that even if application of the decree to the RHCs and BOCs does not offend due process, the RHCs are nonetheless free from the decree's restrictions because the literal terms of the decree limit only the activities of the BOCs and do not purport to constrain the RHCs. We find neither of these arguments persuasive and hold that the RHCs and BOCs are subject to the restrictions of the consent decree.[4]

U.S. West's due process argument fails because it ignores the facts that AT & T was a party to the antitrust proceeding and both the RHCs and the BOCs were wholly owned subsidiaries of AT & T at the time the consent decree was entered. This intimate corporate affiliation distinguishes the instant case from *Sam Fox Publishing Co. v. United States,* 366 U.S. 683, 81 S.Ct. 1309, 6 L.Ed.2d 604 (1961), and *Hansberry v. Lee,* 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940), cited by US West, which held only that class members not adequately represented by class representatives may not be bound by judgments entered against the class. US West also cites *Federal Trade Commission v. Exxon Corp.,* 636 F.2d 1336 (D.C.Cir.1980), which establishes that a company being acquired by another company may be entitled to independent legal representation. US West cites no

---

**4.** The government suggests that we need not reach the merits of this issue because it was not raised by US West in the district court. However, US West did express doubts as to the decree's applicability to the RHCs, Reply Comments of US West to Ameritech's Motion Regarding Shared Tenant Services at 2 n. 2, and the district court felt compelled to respond to US West's contention. *United States v. Western Electric Co.,* 627 F.Supp. at 1093 n. 2. Under these circumstances, our usual reluctance to reach issues not raised in the district court does not prevent us from considering this issue. *See District of Columbia v. Air Florida, Inc.,* 750 F.2d 1077, 1084–85 (D.C.Cir.1984).

authority, however, for the remarkable proposition that a parent may not bind its wholly owned subsidiaries without affording them independent legal representation. It is self-evident that due process does not require such representation. Because the RHCs and BOCs were AT & T's privies in the antitrust proceeding, the consent decree is binding on the former AT & T subsidiaries even though they were not parties to the action. *Southmark Properties v. Charles House Corp.*, 742 F.2d 862, 870 (5th Cir.1984).

■ U.S. West's related suggestion that AT & T breached a fiduciary duty owned to the RHCs and BOCs by consenting to onerous restrictions on its former subsidiaries is both specious and irrelevant. It is specious because the only duty owed by AT & T was to its shareholders, who were identical to the initial RHC shareholders. Even if US West is correct in asserting that AT & T agreed to restrictions on the RHCs and BOCs in order to free itself of restrictions, there was nevertheless no injury to the shareholders. AT & T was merely allocating Bell System assets and liabilities among different portions of the business in anticipation of divestiture. US West's fiduciary duty argument is irrelevant because even if US West could show that AT & T breached such a duty, this would at most demonstrate that the RHCs have a cause of action against AT & T. It would not follow that the RHCs are entitled to judicial relief from the obligations of the consent decree.

■ U.S. West's contention that the RHCs are not restricted under the literal terms of the consent decree also fails upon close examination of the decree. At least three provisions of the decree make clear that the RHCs, as well as the BOCs, are subject to the consent decree's line-of-business restrictions. First, section III of the decree states "[t]he provisions of this [decree], applicable to each defendant and each BOC, shall be binding upon said defendants and BOCs, their affiliates, successors and assigns...." Section IV(A) defines "affiliate" to include "any organiza-

tion or entity, including defendant Western Electric Company, Incorporated, and Bell Telephone Laboratories, Incorporated, that is under direct or indirect common ownership with or control by AT & T or is owned or controlled by another affiliate." As the district court explained in its January 13 decision, because the RHCs were wholly owned subsidiaries of AT & T prior to the divestiture, they are "affiliates" within the meaning of section IV(A) and therefore are bound under section III of the decree. *United States v. Western Electric Co.*, 627 F.Supp. at 1093 n. 2.

Second, section IV(C) defines the term "BOC" to include "any entity directly or indirectly owned or controlled by a BOC or affiliated through substantial common ownership." Because the shareholders of the RHCs directly own the RHCs and indirectly own the BOCs, the RHCs and BOCs are "affiliated through substantial common ownership." *See Braun v. Insurance Co. of North America*, 488 F.2d 1066, 1067 (5th Cir.1974).

Finally, in setting forth the consent decree's line-of-business restrictions, section II(D) states that "no BOC shall, directly or through any affiliated enterprise [engage in conduct proscribed by the decree]." For the reasons stated above, the RHCs are affiliated with their subsidiary BOCs, and the RHCs are accordingly subject to the restrictions of section II(D).

We are not troubled by U.S. West's observation that the decree's expansive definition of a BOC results in broad application of the decree's restrictions to RHCs and other companies affiliated with BOCs. This result is consistent with the decree's objective of sharply limiting the ability of businesses with bottleneck control of local telephone service to utilize their monopoly advantages to affect competition in competitive markets. *United States v. American Telephone and Telegraph Co.*, 552 F.Supp. at 142. It is also consistent with the Supreme Court's recent recognition that, under the antitrust laws, corporations and their wholly owned subsidiaries function as a single enterprise. *Copperweld Corp. v.*

*Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). Moreover, the impact of the decree's restrictions on companies affiliated with BOCs is mitigated by section VIII(C), the decree's waiver provision, which requires that BOCs be granted the right to engage in activities otherwise proscribed "upon a showing by the petitioning BOC that there is no substantial possibility that it could use its monopoly power to impede competition in the market it seeks to enter."

### B. *Extraregional Exchange Services*

Because the RHCs are bound by the decree, it is necessary to reach the issues of consent decree interpretation presented in this appeal. In an earlier decision the district court ruled that two-way mobile telephone and one-way paging services are "exchange telecommunications services" within the meaning of the decree, *United States v. Western Electric Co.*, 578 F.Supp. 643, 645 (D.D.C.1983), and appellants U.S. West, Bell Atlantic, and Pacific Telesis do not now contest this conclusion. They argue, however, that the district court erred in its January 13 decision in ruling that they are prohibited by the decree from providing exchange telecommunications services outside of their respective geographic regions. Their contentions in this regard are supported by *amicus* briefs filed on behalf of Ameritech, BellSouth, NYNEX, and Southwestern Bell.

This court has held that the "construction of a consent decree is essentially a matter of contract law...." *Citizens for a Better Environment v. Gorsuch*, 718 F.2d 117, 1125 (D.C.Cir.1983), *cert. denied*, 467 U.S. 1219, 104 S.Ct. 2668, 81 L.Ed.2d 373 (1984). Accordingly, the district court's construction of the decree is subject to *de novo* review by this court. *See Willie M. v. Hunt*, 657 F.2d 55, 59 (4th Cir. 1981). The principles of consent decree construction were elucidated by the Supreme Court in *United States v. Armour & Co.*, 402 U.S. 673, 682, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971), where it observed that "the scope of a consent decree

must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it." It has further held that in the enforcement of a consent decree, "reliance upon certain aids to construction is proper, as with any other contract." *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 238, 95 S.Ct. 926, 935, 43 L.Ed.2d 148 (1975). These include "the circumstances surrounding the formation of the consent order...." *Id.* We need not decide whether this is a case where it is appropriate to consider evidence extrinsic to the consent decree, because in this case such evidence does not change our result. We conclude that neither the express language of the consent decree nor the circumstances of its formation will support the territorial restrictions imposed on exchange services by the district court.

None of the parties to the instant case contends that an explicit prohibition on the provision of extraregional exchange services is contained within the four corners of the consent decree. The district court found, however, that "it is clear for a number of reasons that the Operating Companies were intended to be limited to their own local areas in furnishing exchange telecommunications services." *United States v. Western Electric Co.*, 627 F.Supp. at 1106. The district court listed eight such reasons, including both provisions of the decree that allegedly contain implicit geographic restrictions on RHC operations, and evidence extrinsic to the decree that purportedly reveals an intent to impose such restrictions. *Id.* at 1106–08. We have considered the reasons identified by the district court, as well as other "aids to construction" cited by the parties, but we are unable to conclude that the parties to the decree reached any agreement on the issue of extraregional exchange services.

We do not agree with the district court that various provisions of the decree implicitly impose geographic restrictions on RHC and BOC operations. The fact that the criteria set forth in section IV(G) for establishing exchange areas are all local in nature has no bearing on the question of

whether a geographic restriction was intended to be imposed on all subsequent RHC and BOC exchange activities. The local nature of these criteria was merely a function of the need, at the time of divestiture, to divide the Bell System's local operations into coherent units in which BOCs could function without entering the interexchange, or long distance, business.

Similarly, the fact that section IV(G) assigned the responsibility for establishing exchange areas within their respective regions to the BOCs reflects nothing more than simple necessity. Prior to January 1, 1984, when the system of exchange areas came into effect, the BOCs were the only providers of local telecommunications service within their respective regions; there was no other logical entity to draw exchange areas. It does not follow from this that each BOC was precluded from providing exchange services in exchange areas drawn by other BOCs.

Identical logic explains why, pursuant to section I of the decree, AT & T assets necessary to provide local telephone service were distributed to the BOCs on a geographic basis. This plan of distribution merely shows that the initial division of markets was geographic; it does not mean that after divestiture the initial geographic boundaries were to be inviolable.

We are unable to understand the district court's suggestion that sections VIII(A) and VIII(B) of the decree, which authorized the BOCs to sell customer premises equipment and publish telephone directories, reveal an intent to geographically restrict other BOC operations. These sections, which were adopted as amendments to the decree at the court's insistence, merely authorize the BOCs to enter lines of business that would otherwise be prohibited to them under section II(D). Sections VIII(A) and VIII(B) plainly do not purport to lift any geographic restrictions on these activities to which the BOCs would be subject in the absence of the sections. Thus, far from supporting the district court's conclusion, the fact that all parties to the decree have assumed that the RHCs and BOCs may sell

customer premises equipment and publish telephone directories on a nationwide basis supports appellants' claims. If the RHCs and BOCs may engage in these activities outside of their regions without a waiver of geographic restrictions, it is not unreasonable to assume that other activities permitted under the decree may be conducted nationwide as well.

■ In view of the foregoing, we conclude that there is no explicit or implicit geographic restriction of RHC and BOC operations contained within the four corners of the consent decree. When we look beyond the language of the decree, we remain unpersuaded that the parties to the decree intended to prohibit provision of extraregional exchange services.

We recognize that certain of the "aids to construction" in this case suggest that the parties and the district court assumed that the RHCs and BOCs would confine themselves to providing exchange services within their respective regions. For instance, in approving the proposed consent decree, the district court stated that "[e]ach of the divested Operating Companies will have a monopoly in only one geographic portion of one [telecommunications] market[]—local telecommunications." *United States v. American Telephone and Telegraph Co.*, 552 F.Supp. at 187. Later, in a portion of its opinion approving the plan of reorganization submitted by AT & T pursuant to section I of the decree, the district court observed that "[w]ith respect to exchange telecommunications ... the Operating Companies and the Regional Companies will, by definition, be limited to clearly defined geographic areas...." *United States v. Western Electric Co.*, 569 F.Supp. 1057, 1081 (D.D.C.1983). Certain RHC filings with the Federal Communications Commission suggest that the RHCs may have shared the district court's understanding. *See* Comments of Associated Bell System Companies at 13, FCC CC Docket No. 83–115 (Apr. 25, 1983); Reply Comments of Associated Bell System Companies at 13, FCC CC Docket No. 83–115 (May 25, 1983); Joint Petition for Reconsid-

eration of Indiana Bell, Michigan Bell, and Ohio Bell at 13, 15, 16, FCC CC Docket No. 83–115 (Feb. 10, 1984).

There are also indications in the record, however, that the drafters of the consent decree did not intend to prohibit the RHCs from furnishing exchange services outside of their respective regions. For example, both Assistant Attorney General for Antitrust Enforcement William F. Baxter and AT & T Vice President and General Counsel Howard J. Trienens testified before committees of Congress that it would have been possible under the consent decree for AT & T to combine all of the BOCs into a single nationwide operating company. *See AT & T Proposed Settlement: Hearings Before the Senate Comm. on Commerce, Science and Transportation,* 97th Cong., 2d Sess. 73 (1982) (testimony of William F. Baxter); *Department of Justice Oversight of the United States v. American Telephone and Telegraph Lawsuit: Hearings Before the Senate Comm. on the Judiciary,* 97th Cong., 2d Sess. 112, 141–42 (1982) (prepared statement of William F. Baxter; testimony of Howard J. Trienens). This conclusion was compelled by section I(A)(4) of the decree, which states that "nothing in this decree shall require or prohibit the consolidation of the ownership of the BOCs into any particular number of entities." The possibility of a single nationwide operating company is obviously inconsistent with the existence of geographic limitations on exchange telecommunications, for if there were only one operating company it would necessarily provide local telephone service throughout the country.

The absence of geographic restrictions is also suggested by events surrounding Bell Atlantic's efforts to solicit the views of the Department of Justice concerning its plans to acquire A Beeper Company. As explained in affidavits filed with the district court, the Justice Department initially advised Bell Atlantic that the fact that A Beeper provided exchange services outside of the Bell Atlantic region would not place Bell Atlantic in violation of the consent decree. *See* Affidavit of James H. Dicker-

son ¶¶ 4–6. In fact, there was internal disagreement within the Justice Department as to whether the consent decree prohibited the provision of extraregional services, but the existence of this disagreement was not initially communicated to Bell Atlantic. *See id.* ¶ 12; Affidavit of James P. Denvir ¶ 6; Supplemental Affidavit of James P. Denvir ¶ ¶ 2, 3; Affidavit of Richard O. Levine ¶ 12. We consider the existence of internal disagreement to be significant, for if the Justice Department found the decree ambiguous in this regard, it is most unlikely that the parties to the decree ever reached an agreement on the issue of extra-regional exchange services.

We suspect that the uncertainty surrounding this issue has a simple explanation: the parties and the district court never considered the possibility that the BOCs might want to provide exchange services outside of their geographic regions. It must be remembered that exchange service consists principally of local landline telephone service, and it is hardly conceivable that one BOC would want to enter another BOC's area in order to provide such traditional service in competition with the established BOC. This case, on the other hand, involves special types of exchange service that can be provided in competition with an established BOC, and we think it likely that the drafters of the consent decree simply did not consider such a possibility. Had they considered it, they might have proscribed it (though in view of its pro-competitive effect, that is far from certain). The question before the court, however, is whether we may now read such a proscription into the decree. Under *Armour* and *ITT Continental Baking,* it is clear that we may not. We therefore reverse the district court's January 13 decision insofar as it held that the RHCs may not provide exchange telecommunications services outside of their respective regions.

C. *Orders Requiring Termination of Extraregional Exchange Services*

Because the consent decree does not limit the RHCs to providing exchange services

within particular geographic areas, it necessarily follows that we must vacate the district court's February 14 order requiring the RHCs to cease providing extraregional exchange services. The court's subsequent orders granting waivers to Pacific Telesis, NYNEX, and Bell Atlantic are not before us. We assume, however, that the court will vacate these insofar as they purport to restrict the right of the RHCs to provide exchange services outside of their respective regions. Like the court's February 14 order, these orders incorrectly presuppose that the RHCs may not furnish such services without court authorization.

### D. *Shared Tenant Services*

■ The final issue presented in this appeal is US West's contention that the district court erred in ruling that Ameritech's proposal to furnish certain shared tenant services would violate the decree's proscription on BOC involvement in the interexchange telecommunications business. The district court reasoned that the types of services Ameritech proposed to provide—least-cost routing and traffic analysis—would inject it into the interexchange business and would therefore contravene section II(D) of the decree. Ameritech has not appealed this decision, and we hold that US West does not have standing to independently appeal the decision.

It is axiomatic that "a party may only appeal to protect its own interests, and not those of a coparty." *Libby, McNeill, and Libby v. City National Bank,* 592 F.2d 504, 511 (9th Cir.1978). *See also Barry v. District of Columbia Board of Elections and Ethics,* 580 F.2d 695, 697 (D.C.Cir. 1978). It follows that the district court's ruling on the shared tenant services issue is properly before this court only to the extent that it binds US West; Ameritech's failure to appeal leaves it subject to the ruling. *United Steelworkers of America v. University of Alabama,* 599 F.2d 56, 59 (5th Cir.1979). Because we conclude that the ruling does not bind US West, we must dismiss US West's appeal for want of standing.

As Ameritech acknowledged in the district court, shared tenant services "are in the gray area of an 'overlap' between exchange and interexchange activities." *United States v. Western Electric Co.,* 627 F.Supp. at 1099. A number of different types of services fall under the shared tenant services rubric, and it is not evident that all of them are properly characterized as interexchange services. In deciding Ameritech's motion for clarification, the district court was required to determine whether the actual services that Ameritech intended to provide were most akin to permitted exchange or prohibited interexchange activities. The court's conclusion that Ameritech's proposal most resembled interexchange service cannot bind US West unless the actual services that US West wishes to provide are identical to those proposed by Ameritech. We have no basis for assuming that US West's proposal would be identical to Ameritech's, and therefore we cannot find that US West is bound by the district court's ruling.

Were we to accept US West's invitation to review the ruling, we would have to speculate as to what services US West might wish to provide, and our decision accordingly would be little more than an advisory opinion. The rules of standing exist precisely to avoid the uncertainty that this course would entail. We accordingly hold that the shared tenant services issue is not properly before this court. If US West wishes to pursue this issue, it should frame its own specific shared tenant services proposal, obtain district court review of the proposal if it deems such review prudent, and then appeal any adverse decision to this court.

### III. CONCLUSION

For the foregoing reasons, we hold that the RHCs are bound by the AT & T consent decree, that the decree imposes no geographic restraints on the areas in which RHCs may provide exchange services, and that the district court erred in ordering the RHCs to stop providing exchange services outside of their respective regions. We do

not decide whether shared tenant services are prohibited interexchange activities under the decree because US West is without standing to obtain review of the district court's ruling on this issue.

*It is so ordered.*